## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

**FREDY CHAVARRO**                     **Case No. 0:13-bk-39933-RBR**
**MARIA PILAR CHAVARRO**               **Chapter 13 case**

      **Debtors.**
_____/

## MOTION TO VACATE ORDER ON MOTION
## TO AVOID JUDICIAL LIEN ON REAL PROPERTY

Heartwood 47, LLC ("Heartwood"), by and through its undersigned counsel and pursuant to Federal Rule of Bankruptcy Procedure 9024 and other applicable law, hereby files its Motion to Vacate Order on Motion to Avoid Judicial Lien on Real Property and, in support, states the following:

### *Background Facts and Procedural History*

1.     On December 18, 2013, Fredy Chavarro and Maria Pilar Chavarro ("Debtors") filed their voluntary petition under Chapter 13 of Title 11 of the United States Code ("Petition Date").

2.     Prior to the Petition Date, on June 28, 2007, the Debtors executed a Credit Agreement and Disclosure ("Note") in favor of BankAtlantic, which memorialized a line of credit available to the Debtors from BankAtlantic in an amount up to $125,000.00, pursuant to the terms set forth in the Note.  A true and correct copy of the Note is attached hereto as **Exhibit A.**

3.     To secure the Note, the Debtors executed a second mortgage ("Mortgage") in favor of BankAtlantic on the real property located at 17105 NW 10th Street, Pembroke Pines, Florida, 33028 (the "Property"), more particularly described as:

Lot 131, Block E, LAKES OF WESTERN PINES REPLAT, according to the Plat thereof, as recorded in Plat Book 157, Page 46, of the Public Records of Broward County, Florida.

A true and correct copy of the Mortgage is attached hereto as **Exhibit B.**

4.      On July 21, 2011, after a default by the Debtors, Bank Atlantic filed a complaint for breach of the Note against the Debtors in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida ("Circuit Court"), Case No. 2011-CA-16912 ("Circuit Court  Case").  The Debtors were represented by Joann M. Hennessey, Esq., in the Circuit Court Case and have at all times relevant been represented by Ms. Hennessey in this Bankruptcy Case.

5.      On July 13, 2012, BankAtlantic assigned its interest in the Note and Mortgage to Heartwood pursuant to an endorsement appended to the Note.  See Exhibit A.  *Bristol v. Wells Fargo Bank, N.A.*, 137 So. 3d 1130, 1133 (Fla. 4th DCA 2014)("The mortgage follows an assignment of the note.")(citing *Taylor v. Bayview Loan Servicing, LLC*, 74 So. 3d 1115, 1118 (Fla. 2d DCA 2011)).

6.      On September 13, 2012, Heartwood was substituted in as party plaintiff in the State Court Case.

7.      On December 13, 2013, the Circuit Court entered Final Judgment in favor of Heartwood and against the Debtors in the amount of $136,147.98, which was recorded in the public records of Broward County, Florida, at O.R. Book 50418, Pages 1038-1039.  A true and correct copy of the recorded Final Judgment is attached hereto as **Exhibit C.**  By operation of law, the Debtors' indebtedness to Heartwood under the Note, as set forth in the Final Judgment, continued to be secured by the Mortgage.  *Klondike, Inc. v. Blair*, 211 So. 2d 41, 43 (Fla. 4th

DCA 1968)("suit on the note or foreclosure of the mortgage are not inconsistent remedies, and pursuit of one without satisfaction is not a bar to the other").

8.      As stated above, on December 18, 2013, five days after entry of the Final Judgment against them in the Circuit Court Action, the Debtors filed their voluntary petition for relief under Chapter 13 of Title 11 of the United States Code.  A Suggestion of Bankruptcy was filed in the Circuit Court Action; however, as explained below, prior to July 2015, that is the only notification that Heartwood ever received as to the existence of the Debtors' Bankruptcy Case.

9.      Despite being filed a mere five days after entry of the Final Judgment in the Circuit Court Action, the creditor matrix which was filed on the Petition Date and accompanied the Debtors' petition failed to identify Heartwood as a creditor of the Debtors (Doc. 1, Pgs. 8-10).

10.     On January 15, 2014, Debtors filed their Schedules and their Statement of Financial Affairs (Doc. 10).  The Debtors' Schedule D correctly identified "Heartwood 47, LLC, 401 East Las Olas Blvd., Suite 800, Ft. Lauderdale, Florida 33301" as having a secured claim on the Property.  The Debtors' Statement of Financial Affairs likewise identified the Circuit Court Action as a lawsuit to which the Debtors were a party within one year of the Petition Date, and specifically identified Heartwood as the plaintiff in that action.   Furthermore, the Debtors' January 15, 2014, filing included a Verification of Creditor Matrix (Doc. 10), which references an "attached list of creditors" but, since no matrix was attached, presumably was intended as verification for the creditor matrix appended to the Debtors' petition filed on December 18, 2013, and described in paragraph 9, above.

11.     Also on January 15, 2014, the Debtors filed their original Chapter 13 Plan (Doc. 13) ("Plan").  The Plan identified Heartwood and its correct address of 401 East Law Olas Blvd., 800, Ft. Lauderdale, FL 33301, in two places.  First, the Plan identified Heartwood as a secured creditor, whose treatment was indicated as "see below."  Then, the Plan provided for valuation of the Property at $180,000.00, and proposed to treat Heartwood "as general unsecured."  Furthermore, the section of the Plan purporting to value the Property and treat Heartwood as a general unsecured creditor (based on valuation of the Property at $180,000.00) provided in all capital letters: "IF YOU ARE A SECURED CREDITOR LISTED BELOW, THE PLAN SEEKS TO VALUE THE COLLATERAL SECURING YOUR CLAIM IN THE AMOUNT INDICATED.  A SEPARATE MOTION WILL ALSO BE SERVED ON YOU PURSUANT TO BR 7004 and LR 3015-3."

12.     On January 16, 2014, this Court entered its Notice of Commencement (Doc. 16), which, among other things, set the proof of claim bar date in the Debtors' case as May 19, 2014.

13.     On January 18, 2014, the Bankruptcy Noticing Center served the Notice of Commencement and filed a Certificate of Notice (Doc. 17) evidencing same.  The Certificate of Notice reflects that Heartwood was <u>not</u> served with a copy of the Notice of Commencement.

14.     Also on January 18, 2014, the Bankruptcy Noticing Center served the Plan and filed a Certificate of Notice (Doc. 18) evidencing same.  The Certificate of Notice reflects that Heartwood was <u>not</u> served with a copy of the Notice of Commencement.

15.     On April 18, 2014, the Debtors filed their Motion to Avoid Lien on Real Property (Doc. 32)("Motion to Avoid Lien"), pursuant to which the Debtors sought to "avoid and cancel" Heartwood's lien on the Property on the ground that it "impairs exemptions to which the Debtor would be entitled under 11 U.S.C. 522(b)."  Accordingly, the Debtors' Motion to Avoid would

seem to seek relief under 11 U.S.C. 522(f), which is separate and distinct from the relief related to valuation of the Property which the Plan and local rules required to be filed and served. More to the point, and irrespective of the propriety of the relief requested in the Motion to Avoid Lien directed to Heartwood, the Certificate of Service (Doc. 35) filed in connection with the Motion to Avoid Lien makes clear that Heartwood was never served with the Motion to Avoid Lien nor with the corresponding Notice of Hearing (Doc. 33).

16.     Following the hearing on the Motion to Avoid Lien, on May 21, 2014, this Court entered its Order on Motion to Avoid Judicial Lien of Real Property (Doc. 47), pursuant to which this Court granted the Debtors' Motion to Avoid Lien. The Certificate of Service (Doc. 49) makes clear that Heartwood was not served with the Order on Motion to Avoid Lien.

17.     On June 4, 2014, this Court entered an Order Confirming Chapter 13 Plan (Doc. 51) ("Confirmation Order"), which confirmed the Debtors' Fifth Amended Chapter 13 Plan (Doc. 48) ("Confirmed Plan"). Since confirmation, the Confirmed Plan has been modified, with Court approval, multiple times (Docs. 69, 75, 78, 82, 86 and 87); however, none of those modifications altered the treatment of Heartwood's secured claim proposed in the original Plan as described in paragraph 11, above, and, more to the point, none of those modifications or the Orders approving same were ever served on Heartwood. See Docs. 72, 80 and 85.

18.     Despite the clear evidence that the Debtors and their counsel knew of, and scheduled, Heartwood's secured claim with respect to the Property, and that the Debtors and their counsel had a correct address for Heartwood on hand (which appears in the Debtors' Schedule D and in every single version of the Plan, as subsequently amended and modified), it is beyond dispute that Heartwood was never served with any of the papers which constitutional due process required to be served on Heartwood (including the Notice of Commencement, the Plan,

the Motion to Avoid Lien, and the Confirmation Order, among others) prior to having its rights as a secured and potentially unsecured creditor altered through the Plan, as amended and modified, and the Orders confirming same.

19.     In fact, Heartwood first became aware of the activity in this Bankruptcy Case on or about July 29, 2015, when Debtors' counsel contacted Heartwood to request that Heartwood take action to release its lien on the Property as purportedly required by this Court's Order on Motion to Avoid Lien (which, by way of reminder, was entered over a year prior, in April 2014).

20.     Accordingly, by this Motion, Heartwood requests that this Court vacate the Order on Motion to Avoid Judicial Lien of Real Property (Doc. 47).[1]

### *Basis for Relief Requested*

21.     It is well established that a secured creditor who has not received notice of a debtor's intent to alter such creditor's interest in the collateral by service of a motion to avoid a judgment lien has not received constitutional due process via adequate notice. *In re Nowling*, 279 B.R. 607, 610 (Bankr. S.D. Fla. 2002)(J. Ray) ("[T]his Court has been mindful of the necessity of proper service by debtors of motions to avoid judgment liens under § 522(f). This Court requires strict compliance with service requirements under Fed. R. Bankr. P. 7004 with regards to these motions in that real property interests are implicated and may be impaired.").

22.     Under these facts, Heartwood did not receive adequate notice of the Debtors' intent to alter or impair any lien rights in the Property by virtue of recordation of the Final Judgment.

---

[1] Heartwood contends that the Debtors indebtedness remains secured by the Mortgage, and that the Order on Motion to Avoid Judicial Lien of Real Property is of little or no consequence; however, Heartwood has concerns that the presence of the Order, purporting to avoid an interest of Heartwood in the property, may confuse title insurers or have other unintended adverse consequences for Heartwood and other interested parties if not vacated as appropriate.

23.     Accordingly, in light of the failure of constitutional due process as to Heartwood, which precluded it from objecting to the Motion to Avoid Judicial Lien, the Order granting that motion is void and should be vacated.

WHEREFORE, Heartwood 47, LLC respectfully requests that this Court enter an Order granting this Motion, vacating the Order Granting Motion to Avoid Judicial Lien, and awarding such other and further relief as this Court deems just and appropriate.

Dated: November 9, 2015

**SHUMAKER, LOOP & KENDRICK, LLP**

By:     /s/ Jay B. Verona
        JAY B. VERONA, Esq.
        Florida Bar No. 352616
        jverona@slk-law.com
        HUGO S. DEBEAUBIEN, Esq.
        Florida Bar No. 58100
        bdebueabien@slk-law.com
        101 E. Kennedy Blvd., Suite 2800
        Tampa, Florida 33602
        Telephone:  (813) 229-7600
        Facsimile:  (813) 229-1660
        *Attorneys for Heartwood 47, LLC.*

# EXHIBIT A



**Florida's Most Convenient Bank**

# CREDIT AGREEMENT AND DISCLOSURE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $125,000.00 | 06-28-2007 | 06-27-2022 | 13491899 | 01C1 / F4 | | 40246 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** FREDY CHAVARRO
MARIA PILAR CHAVARRO
17105 NW 10TH STREET
PEMBROKE PINES, FL 33028

**Lender:** BankAtlantic
SOUTH PEMBROKE STORE
2100 W CYPRESS CREEK ROAD
FT LAUDERDALE, FL 33309

**CREDIT LIMIT: $125,000.00**                                    **DATE OF AGREEMENT: June 28, 2007**

**Introduction.** This Credit Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through BankAtlantic. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean BankAtlantic. You agree to the following terms and conditions:

**Promise to Pay.** You promise to pay BankAtlantic, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: The FastACCESS Equity Credit Card, DEBIT CARD, ATM CARD CANNOT BE USED AFTER THE EXPIRATION OF THE DRAW PERIOD FOR YOUR ACCOUNT. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable at the end of this term. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Florida, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: For fifteen (15) years. You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: There is no separate repayment period, the entire balance hereunder will be due and payable at the end of the Draw Period. You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will be based on a percentage of your outstanding balance plus all accrued FINANCE CHARGES as shown below or $100.00, whichever is greater. Your payments will be due monthly.

| Range of Balances | Number of Payments | Regular Payment Calculation |
|---|---|---|
| All Balances | 180 | 0 556% of your outstanding balance plus all accrued FINANCE CHARGES |

Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment.

In any event, if your Credit Line balance falls below $100.00, you agree to pay your balance in full. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to 1) oldest past due FINANCE CHARGE amount, 2) the oldest past due principal sum of any payment, 3) the oldest past due credit insurance amount, 4) the FINANCE CHARGE amount, principal (if any), credit insurance (if any), and late charges (if any), billed on the last billing statement , 5) any FINANCE CHARGE accrued since the last billing statement, 6) any principal amount or amounts then due and owing.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 2:00 Eastern Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of One Hundred Twenty-five Thousand & 00/100 Dollars ($125,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Line. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Equity Line Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

**Requests By Mail.** Requesting an advance by mail.

**Requests In Person.** Requesting a credit advance in person at any of our authorized locations.

**Credit Card Access.** Using your "FastACCESS Equity Credit Card" to receive cash advances or to make purchases.

**ATM Access.** Using your "FastACCESS Equity ATM Card" at any of our designated ATM locations.

**Other Methods.** As may be offered from time to time by the Bank.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Equity Line Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Equity Line Check.

**Stolen Checks.** Your Equity Line Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Equity Line Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Equity Line Check.

**Transaction Violation.** Your Equity Line Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Equity Line Check.

If we pay any Equity Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Equity Line Check. The Equity Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Equity Line Checks along with your periodic billing statements; however, your use of each Equity Line Check will be reflected on your periodic statement as a credit advance. We do not "certify" Equity Line Checks drawn on your Credit Line.

**Limitations on the Use of Credit Cards.** We reserve the right not to honor FastACCESS Equity Credit Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the FastACCESS Equity Credit Card charge.

**Stolen Credit Cards.** Your FastACCESS Equity Credit Cards have been reported lost or stolen.

**Unauthorized Signatures.** Your FastACCESS Equity Credit Card is not used by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.

**Transaction Violation.** Your FastACCESS Equity Credit Card charge is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Credit Line charge.

**Other Restriction.** BANKATLANTIC FastACCESS Equity Credit Card SIGNATURE BASED TRANSACTION LIMITS WILL APPLY .

If we pay any advance requested by use of the FastACCESS Equity Credit Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the FastACCESS Equity Credit Card will be reflected on your periodic statement as a credit advance.

**Limitations on the Use of ATM Cards.** We reserve the right not to honor FastACCESS Equity ATM Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the FastACCESS Equity ATM Card charge.

**Stolen ATM Cards.** Your FastACCESS Equity ATM Cards have been reported lost or stolen.

**Unauthorized Signatures.** Your FastACCESS Equity ATM Card is not used by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

**Other Restriction.** BANKATLANTIC FastACCESS Equity ATM Card ATM LIMITS WILL APPLY .

If we pay any advance requested by use of the FastACCESS Equity ATM Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the FastACCESS Equity ATM Card will be reflected on your periodic statement as a credit advance.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Equity Line Check, Telephone Request, Request By Mail, In Person Request, Other Methods and ATM Access Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Equity Line Checks, requesting an advance by telephone, requesting an advance by mail, requesting an advance in person, accessing by other methods and using an Automated Transaction Machine ("ATM") access card.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $100.00. This means any Equity Line Check must be written for at least the minimum advance amount.

**Credit Card Limitations.** The following transaction limitations will apply to your Credit Line and using a Credit Card.

**Other Transaction Requirements.** CREDIT CARD LIMITATIONS: If you have sufficient available credit on your account: (1) You can make PIN transactions up to $500 per day (cash and purchase amount combined) at participating merchants/retailers offering cash back when you make a purchase; (2) You can make cash advance withdrawals up to $1,000 per day when you present your card to the teller at any bank that displays the MasterCard logo; (3) You can make signature based/non-PIN transactions up to $2,500 per day to make purchases anywhere MasterCard is accepted.

**Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**Authorized Signers.** The words "Authorized Signer" on Equity Line Checks, FastACCESS Equity Credit Cards and FastACCESS Equity ATM Cards as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Equity Line Checks, FastACCESS Equity Credit Cards and FastACCESS Equity ATM Cards.** If you lose your Equity Line Checks, FastACCESS Equity Credit Cards or FastACCESS Equity ATM Cards or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (954) 431-8305. You also can notify us at our address shown at the beginning of this Agreement.

**Liability for Unauthorized VISA Credit Card Transactions.** Tell us AT ONCE if you believe your VISA credit card has been lost or stolen or of any unauthorized transactions. Your liability for unauthorized use of your credit card with the VISA logo when it is used as a VISA credit card to access this Credit Line will not exceed zero dollars ($0.00). We may require you to provide a written statement regarding claims of unauthorized VISA credit card transactions.

These provisions limiting your liability do not apply to VISA commercial credit cards; ATM transactions or PIN transactions not processed by VISA; and apply only to cards issued in the United States. With respect to unauthorized transactions, these limits may be exceeded to the extent allowed under applicable law only if we determine that you were grossly negligent or fraudulent in the handling of your account or credit card. For specific restrictions, limitations, and other details, see your Cardholder Agreement. To notify us of lost or stolen cards, or of unauthorized transactions, call us at (954) 940-5000 or write to us at BankAtlantic 2100 West Cypress Creek Road, Ft. Lauderdale, FL 33309. This will help prevent unauthorized access to your account and minimize any inconvenience.

**VISA is a registered trademark of Visa International.**

**Liability For Unauthorized MasterCard Credit Card Transactions.** Your liability for unauthorized use of your credit card with the MasterCard logo when it is used as a MasterCard credit card to access your Credit Line will not exceed: (A) Zero dollars ($0.00) if the conditions set forth below have been met, or (B) If those conditions have not been met, the lesser of fifty dollars ($50.00) or the amount of money, property, labor, or services obtained by the unauthorized use before notification to us. Zero liability will apply only if you can demonstrate that you have exercised reasonable care in safe-guarding your card from risk of loss or theft; and (1) you have not reported two or more incidents of unauthorized use to us within the preceding twelve (12) months; and (2) your account is in good standing.

These liability limits apply only to United States issued MasterCard branded payment cards. If the transaction does not meet the conditions set forth above, these limits with respect to unauthorized transactions may be exceeded to the extent allowed under applicable law. For specific restrictions, limitations, and other details, see your Cardholder Agreement. "Unauthorized Use" means the use of your credit card by a person, other than you, who does not have actual, implied, or apparent authority for such use, and for which you receive no benefit. To notify us of lost or stolen cards, or of unauthorized transactions, call us at (954) 940-5000 or write to us at BankAtlantic 2100 West Cypress Creek Road, Ft. Lauderdale, FL 33309.. This will help prevent unauthorized access to your account and minimize any inconvenience.

**MasterCard is a registered trademark of MasterCard International Incorporated.**

**Liability For Unauthorized Use.** You will not be liable for unauthorized use of your Visa access device if you notify us or our designee at BankAtlantic 2100 West Cypress Creek Road, Ft. Lauderdale, FL 33309,(954) 940-5000, orally or in writing, of the loss, theft, or possible unauthorized use.

If you use an access card which debits a checking account (or other consumer asset account) but also draws an overdraft line of credit,

Regulation E provisions apply, as well as sections 226.13(d) and (g) of Regulation Z. In such a transaction, you might be liable for up to $50.00 under Regulation Z. Also, you might be liable for $50.00, $500.00, or an unlimited amount under Regulation E, or a lesser amount under applicable state law. Please refer to your electronic fund transfers disclosure for liability limitations and error-resolution procedures for transactions covered by the federal Electronic Fund Transfers Act.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage dated June 28, 2007, to us on real property located in BROWARD County, State of Florida.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic FINANCE CHARGES for each day in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Wall Street Journal Prime Rate (the "Index"). We will use the most recent Index value available to us as of the 12th for any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your account, we subtract a margin from the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 18.000% or the maximum rate allowed by applicable law. Today the Index is 8.250% per annum, and therefore the initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -1.000% | 7.250% | 0.01986% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any interest or fee for the Credit Agreement and Disclosure which would in any way cause us to contract for, charge or collect more for the Credit Line Account than the maximum we would be permitted to charge or collect by any applicable federal or Florida state law. Any such excess interest or unauthorized fee will be applied first to reduce the unpaid principal balance of the Credit Line Account, and when the principal has been paid in full, be refunded to you.

**Conversion Option.** This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate as calculated below. The following information describes the terms and features of the conversion option available under this Agreement:

> **ANNUAL PERCENTAGE RATE Increase.** Your ANNUAL PERCENTAGE RATE may increase if you exercise this option to convert to a fixed rate.

> **Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods. During the Draw Period as provided in the Fixed Rate Loan Option section below.

> **Rate Determination.** The fixed rate will be determined as follows: Your BankAtlantic Home Equity Line has a fixed rate as described in the Fixed Rate Loan Option section below.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

> **Returned Items.** You may be charged $20.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

> **Late Charge.** Your payment will be late if it is not received by us within 16 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the unpaid amount of the payment.

> **Prepayment Penalty.** If you pay your Credit Line balance in full, you may have to pay a prepayment penalty of the following: Borrower shall have the right to prepay the principal amount outstanding in whole or in part, provided that the Lender hereof may require that any partial prepayments shall be made on the date monthly installments are due and shall be in the amount of that part of one or more installments which would be applicable to principal. Any partial prepayment shall be applied against the principal amount outstanding and shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless the Lender shall otherwise agree in writing. If, within two years from the date of the Note, the Borrower repays and closes out this Account in full, the Borrower shall pay the Lender a prepayment penalty in the following amounts: (a) if such repayment and close out occurs during the first twelve months from the Date of this Credit Agreement, 2% (two percent) of the original principal amount of this Credit Agreement, and (b) if such repayment and close out occurs during the months thirteen through twenty-four from the Date of this Credit Agreement, 1% (one percent) of the original principal amount of this Credit Agreement.

**Security Interest Charges.** You agree to pay all security interest charges related to your Credit Line as set forth below:

| | |
|---|---|
| Flood Life of Loan (MI) (PD BY LENDER) | $3.00 |
| Title Search (R3) (PD BY LENDER) | $50.00 |
| Recording Fees (R2) (PD BY LENDER) | $62.50 |
| Flood Cert Fee (MI) (PD BY LENDER) | $7.00 |
| Appraisal Fee (R3) (PD BY LENDER) | $10.00 |
| **Total** | **$132.50** |

**Special Taxes.** You agree to pay all taxes related to your Credit Line as set forth below:

| | |
|---|---|
| Documentary Stamp (RO) (PD BY LENDER) | $437.50 |
| Intangible Tax (R5) (PD BY LENDER) | $250.00 |
| **Total** | **$687.50** |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example; a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission; foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Line during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust; mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original Index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us the amount of these costs and expenses, which includes, subject to any limits under applicable law, our reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable ANNUAL PERCENTAGE RATE under this Agreement to 18.000 percent per annum. The ANNUAL PERCENTAGE RATE will not exceed the maximum rate permitted by applicable law. If we do not increase the ANNUAL PERCENTAGE RATE upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Equity Line Checks and any other access devices. Any use of Equity Line Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Equity Line Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all Equity Line Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time, except we will be entitled to receive the prepayment penalty as stated above and to receive all accrued FINANCE CHARGES, and other charges, if any. "Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments." Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: BankAtlantic, 2100 W. Cypress Creek Road Ft. Lauderdale, FL 33309.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for

guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: BankAtlantic 2100 W. Cypress Creek Road Ft. Lauderdale, FL 33309.

**Jury Waiver.** We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**Fixed Rate Loan Option.** Your Credit Line also has a fixed rate feature. This means you have the option ("Fixed Rate Loan Option") during the Draw Period to convert all or part of the variable rate portion of your Credit Line to a Fixed Rate Loan Note. You may select a loan term of One (1), Three (3), Five (5), Seven (7) or Ten (10) years. You may not select a Fixed Rate Loan Option term that would exceed the time remaining in the Draw Period. To obtain a Fixed Rate Loan Note, you may write us or call us at the address and telephone number listed above. In addition to the variable rate portion, you may have up to three (3) Fixed Rate Loan Notes outstanding at any time. The aggregate total of all Fixed Rate Loan Notes and outstanding variable rate Line of Credit Advances may not exceed your available Credit Limit. Principal payments you make on the Fixed Rate Loan Notes will increase your available Credit Limit by the same amount. If you elect any Fixed Rate Options, your Minimum Payment required on the variable rate portion of your Line of Credit will be calculated only on the basis of the principal balance of the variable rate portion of your Credit Line. IF MORE THAN ONE PERSON HAS SIGNED THIS AGREEMENT, ANY ONE OF YOU CAN ELECT A FIXED RATE LOAN OPTION AND THAT AUTHORIZATION WILL BE FULLY BINDING TO ALL OF YOU.

a.   Method Used to Determine the Amount of FINANCE CHARGE for a Fixed Rate Loan Note. A daily Finance Charge will be imposed from the date of each Fixed Rate Loan Note posted to your Credit Line based on the "daily balance" method. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on the Fixed Rate Loan Note. Interest on each Fixed Rate Loan Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the annual interest rate over the number of days in a year (366 during leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. The Annual Percentage Rate includes interest and no other costs. Please refer to the BankAtlantic Important Terms of Home Equity Line of Credit disclosure for the Periodic Rates and corresponding Annual Percentage Rates.

b.   Monthly Payments. The minimum monthly payment for each Fixed Rate Loan Note will be equal to an amount of principal and interest sufficient to fully amortize, by equal monthly payments, each Fixed Rate Loan Note over the term selected by you plus, if applicable, accrued interest insurance premiums. The minimum monthly payment for each Fixed Rate Loan Note will be in addition to the Minimum Payment described above for the variable rate portion of your Credit Line.

c.   Periodic Rate and ANNUAL PERCENTAGE RATE. The Periodic Rate and Annual Percentage Rate for each Fixed Rate Loan Note will not change during the term of each Fixed Rate Loan Note. The ANNUAL PERCENTAGE RATE for each Fixed Rate Loan Note will be the sum of the ANNUAL PERCENTAGE RATE of your Fixed Rate Index for the applicable loan term listed below in the Fixed Rate Index Table plus a margin of eight percent (8.00%) (the "Fixed Rate"). If your Credit Line was extended as Wall Street Journal Prime plus a margin, then your Fixed Rate would also include the "Margin Added to Index" rate found in the section entitled "Current Rates for the First Payment Stream" plus the Fixed Rate. Each Fixed Rate Loan Index is equal to the most recent U.S. Treasury Constant Maturities Rate for each U.S. Treasury securities indicated below as published in the Federal Reserve Board Statistical Release H.15, determined by Lender on Tuesday of each week or the first business day immediately following.

| Fixed Rate Index Table | |
| --- | --- |
| Loan Term | Fixed Rate Index |
| 1, 3 or 5 years | Weekly average yield on the two (2) year United States Treasury notes |
| 7 or 10 years | Weekly average yield on the five (5) year United States Treasury notes |

d.   Conversion Fee: If you have one or more Fixed Rate Loan Notes outstanding at the time of electing to establish another Fixed Rate Loan Note, you will be charged a $50.00 processing fee FINANCE CHARGE for each additional Fixed Rate Loan Note.

e.   We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan Option at a discounted ANNUAL PERCENTAGE RATE ("Current Rate") lower than the Fixed Rate as described above. If we provide a Fixed Rate Loan Option at a Current Rate, we are not obligated to offer a Current Rate on any subsequent Fixed Rate Loan Options.

f.   Payments on each Fixed Rate Loan Option are due monthly. The payment date may differ from the variable rate advances from your Credit Line. The payment due date for a Fixed Rate Loan Note will be stated in a periodic statement, or on any payment coupons we provide you. The provisions of this Agreement relating to the form, address, application and servicing of payments on your variable rate Line of Credit shall also apply to payments on Fixed Rate Loan Notes. If we receive payment for your Fixed Rate Loan Note(s) and for your variable rate Credit Line and you do not specify how the payment is to be applied, we will apply the payment in our discretion to the outstanding Fixed Rate Loan Note(s) or variable rate Credit Line. Your first minimum payment for a Fixed Rate Loan Note may be for a period less than one month. If so, we may apply the excess amount of the payment to the outstanding principal balance of the Fixed Rate Loan Note.

g.   All fees, charges, and Lender's rights described in this agreement shall apply to the Fixed Rate Loan Notes.

h.   Failure to meet the requirements of any portion of the Credit Line will be considered a failure to meet the terms of the entire Credit Line and will give us the right to exercise our rights under the section of this Agreement entitled "Lender's Rights".

**Governing Law.** This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Florida.

**Garnishment.** You consent to the issuance of a continuing writ of garnishment or attachment against your disposable earnings, in accordance with Section 222.11, Florida Statutes, in order to satisfy, in whole or in part, any money judgment entered in favor of us.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

BORROWER:

X _____
    FREDY CHAVARRO

X _____
    MARIA PILAR CHAVARRO

Effective Disbursement Date: _____

## Florida Documentary Stamp Tax

**Florida documentary stamp tax in the amount required by law has been paid with respect to this Agreement on the Mortgage securing this Agreement.**

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

BankAtlantic
2100 W. Cypress Creek Road
Ft. Lauderdale, FL 33309
or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

## Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement of the property or services.

<u>ENDORSEMENT ALLONGE</u>
<u>TO NOTE DATED JUNE 28, 2007</u>
<u>IN THE PRINCIPAL AMOUNT OF $125,000.00</u>
<u>MADE BY FREDY CHAVARRO AND MARIA PILAR CHAVARRO</u>

FOR VALUE RECEIVED, BANKATLANTIC, Assignor, the current holder of that certain promissory note called Credit Agreement and Disclosure (referred to herein as "Note")

| | |
|---|---|
| Dated: | JUNE 28, 2007 |
| Made by: | FREDY CHAVARRO AND MARIA PILAR CHAVARRO |
| In Favor of: | BankAtlantic |
| Original Principal Amount: | $125,000.00 |

does hereby endorse the Note payable to the order of HEARTWOOD 47, LLC, a Florida Limited Liability Company, Assignee.

**THE FOREGOING endorsement shall have the same effect as though it were written on the Note itself.**

**ASSIGNEE ACKNOWLEDGES THAT THIS ASSIGNMENT IS WITHOUT RECOURSE TO ASSIGNOR**

Dated: _7/13_____, 2012

BANKATLANTIC:

By _____

    LINDA KILGO, Senior Vice President,
    Manager of Loan Operation
    Services, Revenue Recovery,
    and Strategic Projects

# EXHIBIT B

**PLEASE RETURN TO:**
Shepard & Leskar, P.A.
100 NW 70th Avenue
Plantation, FL 33317
*Courtesy Recordings*



506 49

This Mortgage prepared by:

Name: LYNN PATTESON , LOAN PROCESSOR
Company: BANKATLANTIC
Address: 2100 W Cypress Creek Road, Ft Lauderdale, FL 33309



THIS IS NOT AN OFFICIAL COPY

Florida's Most Convenient Bank

## MORTGAGE

### FOR USE WITH SECURED REVOLVING CREDIT AGREEMENT

**MAXIMUM LIEN.** The total amount of indebtedness secured by this Mortgage may decrease or increase from time to time, but the maximum amount of principal indebtedness which may be outstanding at any one time shall not exceed $125,000.00, plus interest, and amounts expended or advanced by Lender for the payment of taxes, levies or insurance on the Property, and interest on such amounts.

**THIS MORTGAGE** dated June 28, 2007, is made and executed between FREDY CHAVARRO, whose address is 17105 NW 10TH STREET, PEMBROKE PINES, FL 33028 and MARIA PILAR CHAVARRO, A/K/A PILAR CHAVARRO, whose address is 17105 NW 10TH STREET, PEMBROKE PINES, FL 33028; husband and wife (referred to below as "Grantor") and BankAtlantic, whose address is 2100 W CYPRESS CREEK ROAD, FT LAUDERDALE, FL 33309 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in BROWARD County, State of Florida:

Lot 131, Block E, LAKES OF WESTERN PINES REPLAT, according to the Plat thereof, as recorded in Plat Book 157, Page 46, of the Public Records of Broward County, Florida.

The Real Property or its address is commonly known as 17105 NW 10TH STREET, PEMBROKE PINES, FL 33028.

REVOLVING LINE OF CREDIT. This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit under which, upon request by Lender, within twenty (20) years from the date of this Mortgage, may make future advances to Grantor. Such future advances, together with interest thereon, are secured by this Mortgage. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT WITH THE CREDIT LIMIT OF $125,000.00, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until Grantor's interest in any or all of the Property is foreclosed, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and

# MORTGAGE
## (Continued)

acknowledged by Lender in writing, (e) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Subsequent Liens.** Grantor shall not allow any subsequent liens or mortgages on any portion of the Property without the prior written consent of Lender.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Florida law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the maximum amount of your credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of

# MORTGAGE
## (Continued)

any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under the Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all intangible personal property taxes, documentary stamp taxes, fees, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax, including without limitation an intangible personal property tax, upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

OFFICIAL COPY

## MORTGAGE
### (Continued)

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale

shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Mortgage:

Amendments. What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

Caption Headings. Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Florida.

Joint and Several Liability. All obligations of Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

No Waiver by Lender. Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

Severability. If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

Merger. There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

Successors and Assigns. Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

Time is of the Essence. Time is of the essence in the performance of this Mortgage.

Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

DEFINITIONS. The following words shall have the following meanings when used in this Mortgage:

Borrower. The word "Borrower" means FREDY CHAVARRO and MARIA PILAR CHAVARRO and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

Credit Agreement. The words "Credit Agreement" mean the credit agreement dated June 28, 2007, with credit limit of $125,000.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The final maturity date of the Credit Agreement is June 27, 2022. NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

Existing Indebtedness. The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

Grantor. The word "Grantor" means FREDY CHAVARRO and MARIA PILAR CHAVARRO.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Improvements. The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

Indebtedness. The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

Lender. The word "Lender" means BankAtlantic, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

Mortgage. The word "Mortgage" means this Mortgage between Grantor and Lender.

Personal Property. The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Property. The word "Property" means collectively the Real Property and the Personal Property.

Real Property. The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

## MORTGAGE
### (Continued)

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**WAIVER OF FUTURE ADVANCES UNDER PRIOR MORTGAGE.** Grantor hereby agrees that the principal indebtedness secured by any mortgages or security agreements which are senior to the lien of this Mortgage shall not exceed the amount which upon the date of the execution of this Mortgage has actually been advanced and is secured by each such prior mortgage and security agreement. As principal indebtedness of such prior mortgages or security agreements is reduced, the maximum amount that may be secured thereby shall also be reduced to the then outstanding principal balance(s). Grantor hereby waives the right to receive any additional or future advances under any such prior mortgages or security agreements. This paragraph shall constitute the notice required by Florida Statutes Section 697.04(b).

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
FREDY CHAVARRO

X _____
MARIA PILAR CHAVARRO

WITNESSES:

X _____ - FERNANDO A. NUNEZ III

X _____ - MIRYA C. MAYORPOTER -

---

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___FLORIDA___ )
                                               ) SS
COUNTY OF ___BREVARD___ )

The foregoing instrument was acknowledged before me this ___28th___ day of ___JUNE___, 20_07_ by FREDY CHAVARRO and MARIA PILAR CHAVARRO, husband and wife, who are personally known to me or who have produced _FLORIDA DRIVER'S LICENSES_ as identification.

_____
(Signature of Person Taking Acknowledgement)

_____
(Name of Acknowledger Typed, Printed or Stamped)

_____
(Title or Rank)

_____
(Serial Number, if any)

FERNANDO A. NUNEZ III
Notary Public - State of Florida
My Commission Expires Jul 4, 2010
Commission # DD 570671
Bonded By National Notary Assn.

LASER PRO Lending, Ver. 5.38.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. FL I:\CFI\WIN\CFILPL\G03.FC TR-68208 PR-HEG97AA

# EXHIBIT C

**** FILED: BROWARD COUNTY, FL Howard C. Forman, CLERK 12/13/2013 11:25:44 AM.****

IN THE CIRCUIT COURT, IN AND FOR
BROWARD COUNTY, FLORIDA

HEARTWOOD 47, LLC
    Plaintiff,

CASE NO: CACE 11-16912 (05)

vs.

FREDY CHAVARRO AND MARIA PILAR CHAVARRO,
    Defendants.               /

## FINAL JUDGMENT

THIS CAUSE was heard upon Plaintiff, HEARTWOOD 47, LLC's Motion for Final Judgment, upon the pleadings and affidavits on file before the Court, and the Court being fully advised in the premises, it is upon consideration thereof:

ORDERED AND ADJUDGED THAT:

1.      The equities of this cause are with the Plaintiff, it is entitled to maintain this suit, and this Court has jurisdiction of the subject and the parties hereto.

2.      Defendants' Second Amended Answer dated February 2, 2012 raises no issue of fact to be tried by this Court.

3.      The Note herein sued upon was duly and legally executed, acknowledged and delivered to Plaintiff. The Note did and does constitute a good, valid and subsisting obligation to the Plaintiff as stated in Plaintiff's Complaint.

4.      Defendants defaulted in the performance of their obligations under said Note in that the payment due for August 1, 2009, was not made when due nor has said payment or any subsequent payment been made to date hereof on account of said Note secured thereby, and by virtue of the foreclosure action initiated by the holder of another lien upon the property originally securing said Note, and there have been no further payments made to date hereof on account of said Note in accordance with its terms. These defaults constitute a breach of the covenants of the Note herein sued upon

5.      There is presently due and owing Plaintiff under said Note the sum of $117,540.56 on account of principal plus interest in the amount of $11,890.66 and late charges in the amount of $1,966.33 through December 11, 2013. Interest continues to accrue at the highest statutory rate allowable by law per annum.

6.      There is also due Plaintiff the sum of $1,250.43 representing the costs thereto of this suit through December 11, 2013 as follows:

| | |
|---|---|
| Filing Fee: | $421.00 |
| Service of Process: | $80.00 |
| Photocopies: | $132.50 |
| Postage: | $19.43 |
| Messenger | $150.00 |
| Assistance Letter (already pd by BA in 2009. not incl. in Fees): | $300.00 |
| File Retention: | $50.00 |
| AVM: | $30.00 |

HEARTWOOD 47, LLC v. Fredy Chavarro and Maria Pilar Chavarro – Case No. CACE 11-16912

| | |
|---|---:|
| NSF Check Fee: | $20.00 |
| Recording Fees: | $18.50 |
| Certified Copies: | $4.00 |
| Courier (JD Certification) | $25.00 |

together with such further costs as may be incurred by the Plaintiff in this action, including, but not limited to, any advances made by the Plaintiff subsequent to the date specified in this Paragraph, which are proper under the terms of the Note in the event of a default in the payment of the sums hereinafter adjudged to be paid within the time specified.

7. Plaintiff has agreed and promises to pay its attorneys of record herein for their services in and about this suit, a reasonable attorneys' fee to be fixed by this Court; and the Court hereby finds that both the number of hours expended by the attorney and the attorney's hourly rate for such services are reasonable and therefore decrees that $3,500.00 is a reasonable attorneys' fee to be allowed the Plaintiff for the services of its attorneys which sum is also due and owing Plaintiff.

8. The interest of Defendants, FREDY CHAVARRO AND MARIA PILAR CHAVARRO, is subject to the payment of all sums herein found to be due the Plaintiff.

9. The Defendants, FREDY CHAVARRO AND MARIA PILAR CHAVARRO, shall forthwith pay to the Plaintiff or its attorneys, the sums herein specified, to-wit:

| | |
|---|---:|
| Principal, Interest & Late Charges: | $131,397.55 |
| Costs: | $1,250.43 |
| Attorneys' fees: | $3,500.00 |
| Total: | $136,147.98 |

THE TOTAL SHALL BEAR INTEREST AT THE LEGAL RATE, FOR WHICH LET EXECUTION ISSUE FORTHWITH.

10. The address of the Plaintiff is: HEARTWOOD 47, LLC
401 East Las Olas Blvd, Suite 800
Fort Lauderdale, FL 33301

11. Defendants' last known address is: FREDY CHAVARRO AND MARIA PILAR CHAVARRO
17105 NW 10th Street
Pembroke Pines, FL 33028

DONE AND ORDERED, at the Broward County Courthouse, Fort Lauderdale, Florida, this 11 day of December, 2013.

CIRCUIT JUDGE

THOMAS M. LYNCH IV

Copies furnished to:
Michelle J. Gomez, Esquire
Saunders, Curtis, Ginestra & Gore, P.A.
2901 West Cypress Creek Road, Suite 101
Fort Lauderdale, FL 33309
e-service4scgg@comcast.net

Joann M. Hennessey, Esq.
Civil Justice Advocates, PL
3601 W. Commercial Blvd, #18
Fort Lauderdale, FL 33309
notices@cjapl.com; info@cjapl.com